# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

| | | |
|---|---|---|
| In the Matter of the Search of: | ) | |
| Facebook User ID 545645034, Universal Record Locator ("URL") https://www.facebook.com/saul.garcia.9678067 (**"SUBJECT ACCOUNT"**) | ) ) ) ) ) | Case No. *19. MJ - 1351* |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B

The basis for the search under Fed. R. Crim P. 41(c) is:
- ☒ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: 18 United States Code, Section 402 (contempts constituting crimes).

The application is based on these facts: See attached affidavit.

- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Brooks Abramson, DOL-OI
_____

*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: 11/1/19
_____

_____
*Judge's signature*

City and State: Milwaukee, Wisconsin                    William E. Duffin, U.S. Magistrate Judge
*Printed Name and Title*

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, BROOKS ABRAMSON, being first duly sworn, hereby depose and state as follows:

1. I am a Special Agent with the United States ("U.S.") Department of Labor, Office of Inspector General ("DOL-OIG") and have been so employed since 2013.

2. As part of my duties as a DOL-OIG Special Agent, I investigate organized crime affecting the American workforce and crimes against DOL programs, among them fraud in the foreign guest worker visa programs. Prior to my current position, I served for approximately four years in federal law enforcement and criminal intelligence capacities for the U.S. Departments of Homeland Security ("DHS") and State ("DOS"), where I investigated, among other things, U.S. visa fraud and human trafficking crimes. I have received training at the U.S. Customs and Border Protection Law Enforcement Academy and the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia. As a Special Agent, I have participated in the execution of multiple federal search warrants and the review of resultant evidence.

3. This affidavit is made in support of an application for a warrant to search the Facebook Account associated with Facebook User ID 545645034, Universal Record Locator ("URL") https://www.facebook.com/saul.garcia.9678067 ("**SUBJECT ACCOUNT**") that is stored at premises controlled by Facebook.

4.     This affidavit is made in support of an application for a warrant to search **SUBJECT ACCOUNT** for evidence and instrumentalities described further in Attachment B, concerning contempt of court offenses, 18 United States Code, Section 401 (contempt of court order) and Title 18, United States Code, Sections 1512 (witness tampering).

5.     The statements in this affidavit are based on my personal knowledge, on information I have received from other law enforcement personnel, and from persons with knowledge regarding relevant facts.   As this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  Witness interviews and conversations referenced in this affidavit are in summary form and are not verbatim translations of these interviews.

## I.     SUMMARY

6.     Since late October of 2016, the DOL-OIG and the FBI Milwaukee Human Trafficking Task Force have been investigating Garcia & Sons Harvesting, Inc. ("G&S") and C&D Harvesting, Inc. ("C&D"), companies that purport to recruit temporary foreign agricultural workers, primarily from Mexico, for use by various farms throughout Georgia.  As described in detail below, the investigation has revealed that G&S, C&D, and others have defrauded the immigration system by submitting numerous false applications for temporary U.S. work visas.   In particular, G&S, C&D, and others have engaged in a scheme to submit visa applications claiming that prospective employees would come to the U.S. to work in

2

the State of Georgia when, in fact, dozens to hundreds of these workers were sent to farms in the County of Racine in the Eastern District of Wisconsin.

7.    The investigation has further revealed that through this scheme, G&S, C&D and others have engaged in the forced labor and document servitude of intended foreign-national visa beneficiaries. More specifically, witness statements and document review reflect that prior to beginning the term of any employment with G&S or C&D, these businesses required foreign national employees to hand over their foreign passports containing the U.S. visas in order to prevent workers from early departure from their labor obligations.

8.    As is further described below, law enforcement believe that the **SUBJECT ACCOUNT** described in this Affidavit was used in a contemptuous act to contact Adult Victim ("AV") 15 in/around Mid-August of 2019, in contravention of a No Contact Order entered by U.S. Magistrate Judge Honorable William E. Duffin, Eastern District of Wisconsin on August 1, 2019, and evidence and instrumentalities of this crime are likely to be located within the **SUBJECT ACCOUNT**.

## II.    FACTS SUPPORTING PROBABLE CAUSE TO SEARCH

### A.    Background on G&S and C&D

9.    According to commercial and State of Georgia databases, G&S was a Georgia Domestic Corporation in good standing as of 2018. Georgia Secretary of State public records list a Saul GARCIA (the father of Saul GARCIA JR.) as CEO

3

and CFO, and Consuelo GARCIA (the mother of Saul GARCIA JR.) as Secretary with a business address at 108 Tallokas Trail, Moultrie, Georgia 31788.

10. According to commercial and State of Georgia databases, C&D was a Georgia Domestic Corporation in good standing as of 2018. Georgia Secretary of State public records list Daniel GARCIA (Saul GARCIA JR.'s brother) as CEO, CFO, and Registered Agent and Consuelo GARCIA as Secretary with a business address at 108 Tallokas Trail, Moultrie, Georgia 31788.

11. According to an open source search of Facebook made by law enforcement, the **SUBJECT ACCOUNT** bears a photograph of the individual your affiant knows as Saul GARCIA JR., a company official of G&S and C&D. Law enforcement requested preservation of contents of the **SUBJECT ACCOUNT** on September 18, 2019.

## B. Background on H-2A Visa Program

12. Foreign nationals may obtain work authorization in the U.S. through a nonimmigrant visa petitioned on their behalf by a qualifying sponsoring U.S. based employer.[1] A nonimmigrant visa allows a foreign national to enter the U.S. temporarily, to fulfill a specific purpose.[2]

13. One way a foreign national may obtain work authorization in the U.S. is by obtaining an H-2A nonimmigrant visa through a U.S. based agricultural

---

[1] There are limited exceptions to this general procedure, not applicable here.

[2] 8 U.S.C. § 1101(a)(15)

4

employer.[3] The H-2A visa allows a foreign national to work in the U.S. for a maximum uninterrupted period of three years.[4]

14. To apply for the H-2A visa, the prospective U.S. based employer must submit information to the DOL, U.S. Department of Homeland Security ("DHS") / U.S. Citizenship and Immigration Services ("USCIS"), and in most cases, the U.S. Department of State ("DOS").

15. First, the prospective employer or its agent must file a DOL Form 970 Job Order ("Job Order") with the State Workforce Agency in the area of intended employment. The Job Order lists the work hours and location where the intended H-2A workers will be employed. This Job Order causes the State Workforce Agency to begin attempts to recruit U.S. workers (i.e. U.S. Citizens or Lawful Permanent Residents) for the vacant agricultural jobs reported by the employer.[5] The employer themselves must also typically attempt their own recruitment efforts by posting advertisements for U.S. workers in a newspaper in the area of intended employment.[6] These steps are performed to adequately test the local jobs market for domestic labor.

16. Once the Job Order has been placed, and recruitment efforts for U.S. workers exhausted, the employer can submit a DOL Form 9142 Application for

---

[3] 8 U.S.C. § 1101(a)(15)(H)

[4] 8 C.F.R. § 214.2(viii)(b)

[5] 20 C.F.R. § 655.121

[6] 20 C.F.R. § 655.151

5

Temporary Employment Certification ("ATEC") to the DOL either by mail or internet submissions. Whether mailed or remitted via internet, the ATEC is received at the DOL's Francis Perkins Building, 200 Constitution Avenue Northwest, Washington, D.C. The ATEC lists, among other things, steps taken to recruit U.S. workers, proffered wages to the intending H-2A workers and specific work locations, including worksite addresses. The DOL cannot certify (i.e. approve) the ATEC until the prospective employer has demonstrated that there are not sufficient able, willing and qualified U.S. workers and that U.S. wages will not be adversely affected by the intending H-2A beneficiaries. If submitted electronically, the ATEC does not require an original signature at the time of submission. Before the certified ATEC can be forwarded onto the DHS for final approval, however, it must be signed by both the U.S. based employer and their agent/preparer (if applicable) under penalties of perjury.

17.    Once the ATEC is certified, the U.S.-based employer submits a DHS Form I-129 Petition for a Nonimmigrant Worker ("petition") to USCIS for final adjudication. The Petition lists, among other things, the wage levels and specific work locations where the intending H-2A's will be placed. The petition must also be signed by both the U.S. based employer and their agent/preparer under penalties of perjury.

18.    Upon receiving USCIS approval, the U.S. based employer will be notified that their intending H-2A beneficiaries can present themselves in person to the nearest U.S. Embassy or Consulate for a visa interview by DOS officials.

6

Although the foreign national does not have to sign the ATEC or Petition under penalties of perjury, they are required to provide a fingerprint certifying their visas are true and correct under penalties of perjury at the time of the visa interview held abroad.

19.     Once approved, an H-2A visa is affixed to the foreign national's passport, which the individual can present to U.S. Customs and Border Protection officials at any U.S. port of entry to apply for admission into the U.S. as an H-2A temporary agricultural worker.

### C.     Background on the Investigation and Prosecution

20.     Since late October of 2016, law enforcement has been investigating the use of G&S workers by Borzynski Farms and its affiliated entities ("Borzynski" herein), who were present and working in Wisconsin illegally, i.e., in violation of their H-2A visas, within the Racine, Wisconsin area during both the summer of 2015 and the summer of 2016.

21.     In or around August of 2016, the State of Wisconsin's State Workforce Agency, the Wisconsin Department of Workforce Development ("WDWD"), assisted by migrant worker advocates, visited the Riverside Inn ("Riverside"), located in Racine, Wisconsin, based on a tip that hundreds of foreign national migrant workers were staying at Riverside and working at local farms, among them Borzynski. WDWD inspectors encountered Saul GARCIA JR. ("GARCIA JR."), who purported to be in charge of the G&S crews. WDWD requested and GARCIA JR.

7

provided a list of all G&S workers by name as well as the migrant labor contracts for each worker.

22. During a follow-up encounter in September of 2016, migrant advocates attempted to make contact with the G&S workers at the Riverside to offer food assistance vouchers to the G&S workers. While attempting to speak with the G&S workers, GARCIA JR. attempted to obstruct access to his workers by not allowing direct access or being in close proximity while advocates attempted to address the G&S workers. GARCIA JR. appeared most intrusive when advocates asked about the G&S workers' pay to verify their eligibility for food voucher assistance. Due to these concerns, federal law enforcement was notified.

23. On November 7, 2016, the DOL-OIG learned from WDWD investigators that a G&S H-2A employee called WDWD seeking work. The G&S worker provided the name of J.R. to WDWD investigators. The name J.R. was not on the list provided by GARCIA JR. to WDWD. J.R. stated to WDWD investigators that he/she met with a WDWD investigator around August or September 2016 when they were at the Riverside. J.R. was residing with the other G&S workers at the Riverside at the time. WDWD notified law enforcement, who began vetting the list of G&S workers provided by GARCIA JR. to WDWD. Investigators were unable to locate any consular, immigration, or work authorization for many of the reported G&S employee names.

24. Between late evening on November 8, 2016 and early morning on November 9, 2016, three of the four G&S buses departed Racine, Wisconsin to a

8

location unknown to law enforcement. This development, plus the fact that the harvest season was ending, led law enforcement to plan for an encounter with the last remaining G&S workers.

25. During the afternoon of November 10, 2016, FBI Milwaukee Human Trafficking Task Force and DOL-OIG, aided by local counterparts, performed a traffic stop of the last remaining G&S school bus in Mount Pleasant, Wisconsin after it departed a Borzynski property based on reasonable suspicion that visa fraud and labor trafficking was taking place.

26. During the traffic stop, agents encountered 23 workers in the bus, which was driven by an unlicensed worker among the group. Agents learned that the only female on the bus, who identified herself as Fernanda Casillas ("Casillas"), was the crew leader. Casillas is the aunt of Saul GARCIA JR. Casillas related to a DOL-OIG special agent that every worker on the bus worked for Borzynski and was undocumented.[7]

27. When asked to identify themselves, other passengers on the bus provided agents with what appeared to be fraudulent DHS I-551 U.S. Permanent Resident Cards ("resident card"). Despite presenting resident cards, many passengers told agents that they were present in the U.S. on H-2A agricultural workers visas. Based on your affiant's training and experience, a resident card in and of itself confers legal authorization for an individual to be present and work in

---

[7] The interview took place in the Spanish language with the law enforcement officers on scene being proficient in spoken and written Spanish.

9

the U.S.; therefore, a resident card holder would have no need for a temporary work visa (i.e. an H-2A).

28.     Upon being fingerprinted on scene for proper identification, most of the workers' identities came back to U.S. H-2A visas issued oversees, and the identities on the H-2A visas did not match the identities on the apparently fraudulent resident cards in the workers' possession.

29.     After being properly identified, several workers provided voluntary statements to law enforcement during the evening of November 10, 2016[8] and during the remaining course of the investigation. Of the workers first encountered, twelve total adult victims ("AVs") remained in the U.S. Law enforcement debriefed AV's 1 through 12 during the course of the investigation, and these AVs generally described GARCIA JR.'s role as the crew leader for the illegally moved Wisconsin H-2A workers in 2016, taking charge of or ordering the confiscation of the victims' true Mexican passports, the issuance of fraudulent identity documents to obfuscate the workers' identities and paychecks bearing the names listed on the fraudulent

---

[8] On-scene fingerprinting on November 10, 2016 and subsequent checks did not reveal any criminal history for the workers interviewed, including AV's 1 through 15, and many workers made statements against their penal and financial interests. Law enforcement has independently corroborated portions of the workers' statements. For those who remain in the U.S. through pendency of a potential criminal trial, law enforcement applied for Deferred Action and/or Continued Presence temporary immigration remedies for witness/victims. Deferred Action is a temporary immigration status that confers work authorization and is not crime-specific. Continued Presence is a temporary immigration status that confers work authorization and allows for more permanent immigration remedies (not sought directly by the U.S. government) as it is specifically designed for victims of Human Trafficking.

10

identity documents, and also the deduction of purported "taxes" from the Wisconsin workers' paychecks.

30.     In or around September of 2018, law enforcement located two additional AVs in southern Georgia working for another H-2A farm labor contractor operated by Individual A[9], a second cousin of GARCIA JR. AVs 13 and 14 provided statements to law enforcement, which corroborated statements of other victims regarding GARCIA JR.'s control of the Wisconsin crews in 2016. Additionally, AVs 13 and 14 stated that GARCIA JR. was the supervisor of the crew illegally brought to work in Wisconsin in 2015 as well as 2016. After law enforcement served AVs 13 and 14 with grand jury subpoenas to testify in the U.S. District Court, Eastern District of Wisconsin, AVs 13 and 14 later told law enforcement that Saul Garcia attempted to influence and prevent their testimony before the grand jury.

31.     As a result of the aforementioned testimony and other evidence gathered and presented in the case, a grand jury in the Eastern District of Wisconsin returned a ten-count indictment on May 21, 2019 charging Saul Garcia., GARCIA JR., Daniel Garcia, Consuelo Garcia and Maria Remedios Garcia-Olalde (i.e. GARCIA JR.'s paternal aunt) with various labor trafficking, visa, conspiracy and, in the case of Saul Garcia, two counts of witness tampering crimes (*See* Case 19-CR-96, E.D. Wisconsin).

---

[9] Neither Individual A nor his/her company have been charged with any crimes as of the date of the instant application.

11

32.     After the defendants were indicted, a concerned citizen contacted the Office of the U.S. Attorney, Middle District of Georgia seeking assistance on behalf of another AV, AV-15. Law enforcement interviews of AV-15 suggested that AV-15 experienced similar treatment in 2015 and 2016 as reported by other AVs identified during the course of this investigation, and which conduct was charged in the aforementioned indictment.

33.     Subsequent to the indictment of GARCIA JR. and others in the scheme, and due in part to the alleged witness tampering, the United States sought and Magistrate Judge William H. Duffin granted the motion for a No Contact Order on August 1, 2019 prohibiting GARCIA JR. and his co-defendants from having direct or indirect contact with any of the workers alleged to have been illegally moved from Georgia to Wisconsin in 2015 and 2016; this group of workers included AVs 1 through 15.

34.     At his/her own behest, AV-15 was interviewed by law enforcement in/around July of 2019 and appeared for grand jury testimony on/around September 11, 2019. During his/her mid-September 2019 debrief, AV-15 informed law enforcement that, within the past few weeks, and sometime around mid-August 2019 (i.e. in contravention of the No Contact Order entered on August 1, 2019), someone using the **SUBJECT ACCOUNT** attempted to friend request AV-15. AV-15 shared a screen shot of the **SUBJECT ACCOUNT** from his cell phone, and your affiant notes that the home screen of the **SUBJECT ACCOUNT** bore a photograph

12

of a man your affiant knows to be GARCIA JR., who your affiant has personally encountered and spoken with on various occasions.

## TECHNICAL BACKGROUND

35.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

36.     Facebook asks users to provide basic contact information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

37.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, to all Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

13

38.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "Mini-Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

39.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

40.     Facebook has a Photos application, where users can upload an unlimited number of albums and photos. Another feature of the Photos application is the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a

14

link to see the photo or video. For Facebook's purposes, a user's "Photoprint" includes all photos uploaded by that user that have not been deleted, as well as all photos uploaded by any user that have that user tagged in them.

41.     Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

42.     Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

43.     The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

44.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

45.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications on the Facebook platform.

15

When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

46. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; Mini-Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

47. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

48. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and

16

source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their account, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

49.     Therefore, the computers of Facebook are likely to contain all the material just described, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and account application.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

50.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

17

## CONCLUSION

51. Based on my training, experience and consultation with other agents familiar with electronic crimes investigations, and the facts as set forth in this affidavit, there is probable cause to believe that on the computer systems in the control of Facebook there exists evidence of a crime.

52. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).]

53. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

18

# ATTACHMENT A
## Property to Be Searched

This warrant to applies to information associated with the following Facebook user ID and stored at premises owned, maintained, controlled, or operated by Facebook, a company headquartered in Menlo Park, California:

| NAME | FACEBOOK ID (UID) | FACEBOOK NAME |
|------|-------------------|---------------|
| Saul Garcia | 545645034 <br><br> https://www.facebook.com/saul.garcia.9678067 | Saul Garcia |

2

## ATTACHMENT B
## Particular Things to be Seized

### I. Information to be disclosed by Facebook

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a) All contact information, including full name, user identification number, birth date, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b) All Photoprints, including all photos uploaded by that user ID and all photos uploaded by any user that have that user tagged in them;

(c) All Neoprints, including profile contact information; Mini-Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(d) All other communications and messages made or received by the user, including all private messages and pending "Friend" requests;

(e)     All IP logs, including all records of the IP addresses that logged into the account;

(f)     All information about the user's access and use of Facebook Marketplace;

(g)     The length of service (including start date), the types of service utilized by the user, and the means and source of any payments associated with the service (including any credit card or bank account number);

(h)     All privacy settings and other account settings;

(i)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

## II.     Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 18, United States Code, Sections 1512 (witness tampering) and 401(3) (contempt of a court order) involving Saul Garcia, Jr., since May 22, 2019, including, for the user ID identified on Attachment A, information pertaining to the following matters:

(a)     Communications between known subjects.  Communications between Saul Garcia Jr.'s Facebook account either via private message, posting or any other type of communication with the victims or witnesses subject to the Court's No Contact Order in this case.

2

(b)     Communications related to photos/attachments. Communications with the witnesses or victims subject to the Court's No Contact Order in this case.

(c)     Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(d)     Records relating to who created, used, or communicated with the user ID.

3

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct. I am employed by Facebook, and my official title is _____. I am a custodian of records for Facebook. I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of Facebook, and that I am the custodian of the attached records consisting of _____ (pages/CDs/kilobytes). I further state that:

a.     all records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

b.     such records were kept in the ordinary course of a regularly conducted business activity of Facebook; and

c.     such records were made by Facebook as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.

_____        _____
Date                         Signature